1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

EARNEST FORD,

                Plaintiff,

    v.

STATE OF WASHINGTON,
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES, et al.,

                Defendants.

CASE NO. C09-5743BHS

ORDER GRANTING
DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT

      This matter comes before the Court on Defendants' motion for summary judgment (Dkt. 23). The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the file and hereby grants the motion for the reasons stated herein.

## I. PROCEDURAL HISTORY

      On November 27, 2009, Plaintiff Earnest Ford ("Ford") filed the original complaint in this action alleging claims against Defendants relating to his employment at Western State Hospital ("WSH"). On February 24, 2010, Ford filed his first amended complaint (Dkt. 4) and on April 20, 2010, he filed his second amended complaint (Dkt. 12). On December 22, 2010, Defendants filed their motion for summary judgment. Dkt. 23. On January 10, 2011, Ford responded (Dkt. 35) and on January 14, 2011, Defendants replied (Dkt. 42).

ORDER - 1

1

## II. RELEVANT FACTUAL BACKGROUND

2

The following facts are undisputed unless otherwise indicated:

3

**A.     Ford's Temporary Positions at WSH**

4

On June 16, 2006, Ford was appointed to a temporary position as an Institutional

5

Counselor 3 ("IC3") at WSH.  Dkt. 32 at 2-3.  Prior to June 16, 2006, Ford was working

6

as a Psychiatric Security Attendant ("PSA") in an evening shift position.  *See* Dkt. 36 at

7

9.  On March 28, 2007, Dr. Andrew Phillips ("Dr. Phillips"), CEO of WSH, approved Art

8

Kelly's (Ford's program manager) request for Ford's IC3 position to be made permanent.

9

Dkt. 25 at 2-3.  Following this approval, Dr. Phillips pulled back several of these

10

conversion approvals, including Ford's, to insure that such conversions had been

11

properly approved as DSHS was implementing new policies regarding these conversions.

12

*Id*. at 2-3.  In reviewing Kelly's request regarding Ford, Dr. Phillips noted that such

13

request had not been approved by WSH's CFO or Human Resources Director as was

14

required under WSH policy.  *Id*.  In early April 2007, Dr. Phillips informed Ford that he

15

was not being converted to a permanent position.  *Id*. at 3-4.

16

17

Following an evaluation meeting held on May 31, 2007, between Ford and WSH

18

personnel, Dr. Jeni Gregory, Ford's supervisor at the time, informed Ford in a letter from

19

WSH that it was terminating his temporary IC3 position.  Dkt. 32 at 2-3. On June 4, 2007,

20

Ford was reappointed to a temporary IC2 position.  *Id*. at 3.  Later in June 2007, Ford's

21

temporary IC2 position was ended, as well as his July 2007 temporary appointment.  Dkt.

22

30 at 2.  According to WSH, Ford was terminated from his temporary IC2 position due to

23

concerns it had with Ford working with patients after Kelli Saatchi ("Saatchi"), a WSH

24

Nurse Manager, received a phone call on June 19, 2007, informing her that Ford had been

25

arrested for domestic violence.  Dkt. 30 at 2; *see* Dkt. 24 at 29-40.  Because the Court

26

concludes that Ford is barred by the applicable statute of limitations from bringing a

27

28

ORDER - 2

1   lawsuit seeking remedies for actions occurring before July 27, 2007 (*supra* section III.D),

2   no further detail of the facts alleged prior to that date is necessary.

3   **B.      Long Term Disability Claim**

4           After Ford was no longer working in his IC2 position, he filed a claim with

5   Standard Insurance Company ("Standard") to receive long term disability benefits.  *See*

6   Dkt. 39-1 at 3.  In a letter dated January 31, 2008, Art Stratton ("Stratton"), Human

7   Resources Manager for WSH, received a request from Joanna Roork ("Roork"), a senior

8   disability benefits analyst with Standard, to provide her with information concerning

9   Ford's employment with WSH.  Dkt. 26 at 6.  On March 7, 2008, WSH received a second

10  request from Standard for the information regarding Ford's employment with WSH and

11  responded in a letter to Roork dated March 17, 2008, that it would begin gathering the

12  requested information.  *See id*. at 7.  Certain records were provided to Standard in April

13  2008 and in a letter dated April 18, 2008, WSH notified Standard that additional

14  documents were forthcoming.  *Id*. at 9.  On April 28, 2008, WSH provided the remaining

15  documents to Standard.  *Id*. at 10.  In a letter dated June 30, 2008, Standard informed

16  Ford that his claim for long term disability benefits was approved for the period

17  beginning June 27, 2007, through December 2, 2007.  Dkt. 24 at 52-54.

18

19  **C.      Unemployment Benefits Claim**

20          In April 2008 Ford applied for unemployment benefits through the State of

21  Washington Employment Security Department ("ESD").  Dkt. 36 at 9.  On April 14,

22  2008, Stratton received a Claimant's Separation Statement from ESD regarding Ford's

23  claim.  Dkt. 26 at 3, 11-12.  According to Stratton, at the time he filled out the ESD

24  separation statement, it was his understanding that Ford was still employed by WSH and

25  had objected to returning to his permanent position as a PSA.  *Id*. at 3.  Stratton later

26  learned that Stephanie Barron ("Barron"), the WSH Reasonable Accommodation

27  Specialist assigned to Ford's request, had received notification in early April 2008 that

28

1    Ford was not capable of returning to his permanent position as a PSA because it would

2    require contact with aggressive WSH residents.  Dkt. 44 at 1; *see* Dkt. 34 at 2.  The WSH

3    Human Resources office received a letter on January 15, 2008, stating that Ford could

4    return to work for a day shift position only.  Dkt. 39-1 at 14.  Ford contends that Stratton

5    must have known of this limitation and that Ford could not return to his evening PSA

6    position when Stratton filled out the ESD separation statement.  Dkt. 36 at 9.  Stratton

7    maintains that, at the time he filled out the ESD separation statement, he was unaware of

8    the information provided by Barron regarding Ford's ability to return to his position as a

9    PSA.  *Id*.  In a letter dated June 5, 2008, ESD informed WSH and Ford that his

10   application for benefits was granted.  Dkt. 24 at 24-25.

11   **D.      Reasonable Accommodation**

12          In January 2008 the Investigations and Reasonable Accommodation Unit within

13   the Human Resources Division of DSHS received a reasonable accommodation request

14   regarding Ford.  Dkt. 34 at 1-2.  Barron was assigned to handle Ford's request.  *Id*.  On

15   January 29, 2008, a letter was delivered to Ford along with a questionnaire to be filled out

16   by Ford's medical provider, Dr. Lisa Corthell ("Dr. Corthell"), and returned to DSHS so

17   Barron could further review his request for an accommodation.  *Id*.  On February 20,

18   2008, Barron received a response from Dr. Corthell stating that Ford suffered from major

19   depression and that Dr. Corthell believed he could return to work immediately if a day

20   shift position was available.  *Id*. at 6-8.  Following an April 2, 2008, meeting between

21   Barron, Ford, and others, it was determined that Ford could not return to work in his

22   position as a PSA and DSHS agreed to make a good faith effort to reasonably

23   accommodate Ford in a new position.  *Id*. at 2.

24          On April 4, 2008, Barron received an email stating that a day shift PSA position

25   with Wednesdays and Thursdays off was available at WSH.  *Id*.  On April 18, 2008,

26   Barron received a letter from Dr. Corthell stating that she had advised Ford not to accept

27

28

ORDER - 4

the PSA position after he told her that the position would require contact with clients with a high potential for dangerous behavior. *Id*. at 2-3.  After receiving this letter, Barron narrowed her reasonable accommodation search for Ford to positions that did not involve contact with clients with a high potential for dangerous behavior, as well as narrowed the search geographically following a request from Ford to do so.  *Id*. at 3.

On September 25, 2008, Barron informed Ford that a Customer Service Specialist 2 position was available at the Auburn Community Services office and on November 4, 2008, Barron notified Ford by mail that he had been reassigned to this position.  *Id*. at 4. On December 23, 2008, Barron closed Ford's reasonable accommodation file because his reassignment had been accomplished.  *Id*.

**E.     Ford's Complaints**

In April 2007 Ford made several complaints to different WSH personnel including Dr. Gregory, Dr. Phillips and Rebecca Quinn ("Dr. Quinn"), Director of the Center for Adult Services, regarding his temporary position not being converted to a permanent one and his belief that certain Caucasian employees' positions were being converted.  Dkt. 36 at 3-5.  On June 1, 2007, Ford filed a union grievance regarding WSH's failure to convert his IC3 job to a permanent position.  Dkt. 39 at 3.  On June 20, 2007, Ford filed a union grievance regarding WHS personnel's failure to keep an email containing confidential information that may have been damaging to his reputation.  *Id*. at 5.  On June 28, 2007, Ford filed a union grievance regarding WSH's termination of his temporary IC2 position. *Id.* at 2.  On November 27, 2007, Ford filed a complaint with the Washington Human Resources Division Investigations and Reasonable Accommodations Unit alleging racial discrimination on the part of WSH.  *Id*. at 6-8.  In December 2007, Ford filed a complaint with the Office of the Governor of the State of Washington alleging discrimination on the part of WSH.  *Id*. at 9-11.  In March 2008 Ford filed complaints with the Mayor's office for the City of Lakewood and the Lakewood City Council alleging discrimination on the

1   part of WSH.  *Id*. at 8; *see* Dkt. 39-1 at 2.  Finally, on April 10, 2008, Ford filed a

2   complaint with the United States Department of Health and Human Services Office for

3   Civil Rights alleging discrimination on the part of WSH.  *Id*. at 1.

### III. DISCUSSION

5   In his second amended complaint, Ford brings the following causes of action

6   against Defendants: (1) racial discrimination in violation of Title VII of the Civil Rights

7   Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII"); (2) retaliation in violation of Title

8   VII; (3) discrimination in violation of the Americans with Disabilities Act of 1990, 42

9   U.S.C. § 12101 et seq. ("ADA"); (4) racial discrimination in violation of the Washington

10   Law Against Discrimination, RCW § 49.60.010, et seq. ("WLAD"); (5) retaliation in

11   violation of the WLAD; (6) disability discrimination in violation of the WLAD; (6)

12   negligent infliction of emotional distress; (7) outrage; and (8) negligence and negligent

13   hiring, retention and supervision.  Dkt. 12.

14

15   **A.   Summary Judgment Standard**

16   Summary judgment is proper only if the pleadings, the discovery and disclosure

17   materials on file, and any affidavits show that there is no genuine issue as to any material

18   fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

19   The moving party is entitled to judgment as a matter of law when the nonmoving party

20   fails to make a sufficient showing on an essential element of a claim in the case on which

21   the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

22   (1986).  There is no genuine issue of fact for trial where the record, taken as a whole,

23   could not lead a rational trier of fact to find for the nonmoving party.  *Matsushita Elec.*

24   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must

25   present specific, significant probative evidence, not simply "some metaphysical doubt").

26   *See also* Fed. R. Civ. P. 56(e).  Conversely, a genuine dispute over a material fact exists if

27   there is sufficient evidence supporting the claimed factual dispute, requiring a judge or

28

1   jury to resolve the differing versions of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477

2   U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

3   626, 630 (9th Cir. 1987).

4          The determination of the existence of a material fact is often a close question. The

5   Court must consider the substantive evidentiary burden that the nonmoving party must

6   meet at trial – e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477

7   U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630.  The Court must resolve any factual

8   issues of controversy in favor of the nonmoving party only when the facts specifically

9   attested by that party contradict facts specifically attested by the moving party.  The

10  nonmoving party may not merely state that it will discredit the moving party's evidence at

11  trial, in the hopes that evidence can be developed at trial to support the claim.  *T.W. Elec.*

12  *Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson,* 477 U.S. at 255).  Conclusory,

13  nonspecific statements in affidavits are not sufficient, and missing facts will not be

14

15  presumed.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

16  **B.     Dismissal of Claims**

17         Defendants' motion for summary judgment seeks dismissal of all claims alleged

18  against them in Ford's second amended complaint. Dkt. 23.  In his response to the

19  motion for summary judgment, Ford only asserts that he can establish genuine issues of

20  material fact with respect to the following claims: (1)  retaliation under Title VII,

21  (2) retaliation under the WLAD, and (3) negligent infliction of emotional distress.  Dkt.

22  35 at 8.  Accordingly, the Court concludes that the following claims should be dismissed

23  with prejudice: (1) racial discrimination under Title VII and the WLAD; (2)

24  discrimination under the ADA; (3) disability discrimination under the WLAD; and (4)

25  negligence and negligent hiring, retention and supervision.

26

27

28

ORDER - 7

1

**C.     Remaining State Law Claims**

2

Ford alleges claims against Defendants for retaliation in violation of the WLAD,

3

negligent infliction of emotional distress and outrage.  The Eleventh Amendment to the

4

United States Constitution bars citizens from bringing suit against a state, or its agencies,

5

in federal court.  *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).

6

There are two exceptions to a state's Eleventh Amendment immunity: (1) a state may

7

consent to suit against it in federal court (*see Hans v. Louisiana*, 134 U.S. 1 (1890)); or

8

(2) Congress, in certain situations, may abrogate a state's Eleventh Amendment immunity

9

(*see Pennhurst*, 465 U.S. at 99).

10

Here, Defendants maintain that Ford's claims for retaliation in violation of the

11

WLAD and negligent infliction of emotional distress must be dismissed because Congress

12

has not abrogated the state's Eleventh Amendment immunity in this area and because

13

Washington has not consented to being sued in federal court.  Dkt. 23 at 10.  Ford argues

14

that Washington has waived sovereign immunity through its Tort Claims Act and the

15

WLAD and that under those statutes, Washington has also consented to being sued in

16

federal court.  Dkt. 35 at 9-12.  However, a state's  waiver of sovereign immunity, that is,

17

its consent to be sued in its state courts, is not considered consent to be sued in federal

18

court.  *Lee v. Murphy*, 844 F.2d 628 (9th Cir. 1988).  Rather, a state's consent to be sued

19

in federal court must "be unequivocally expressed." *Pennhurst*, 465 U.S. 89, 99 (1984).

20

First, the Court concludes that Ford's negligent infliction of emotional distress and

21

outrage claims, brought under the Tort Claims Act, must be dismissed with prejudice as

22

the Washington Supreme Court has specifically held that the state does not consent to

23

being sued in federal court under that statute.  *Rains v. State*, 100 Wn.2d 660, 666-68

24

(1983).  In addition, the Court concludes that Ford's claim for retaliation under the

25

WLAD must be dismissed with prejudic as he has failed to show where in the statute

26

27

28

ORDER - 8

Washington has "unequivocally expressed" its consent to be sued in federal court under that statute. *Pennhurst*, 465 U.S. at 99.

## D.     Retaliation Under Title VII

As an initial matter, Defendants argue, and Ford concedes, that Ford's Title VII retaliation claims involving Defendants' actions prior to July 27, 2007 are barred by the statute of limitations as such actions occurred more than 300 days prior to his filing of his Washington State Human Rights Commission complaint on May 22, 2008. *See* 42 U.S.C. § 2000e-5(e)(1) (stating that a Title VII charge filed with a state agency, in lieu of filing a charge with the Equal Employment Opportunity Commission, must be filed within 300 days after the alleged unlawful employment practice occurred). Accordingly, the Court will only consider Defendants' actions that occurred on or after July 27, 2007, in analyzing Ford's Title VII retaliation claim.

Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3. To make out a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that "(1) [he] engaged in a protected activity, (2) [he] suffered an adverse employment action, and (3) there was a causal link between [his] activity and the employment decision." *Raad v. Fairbanks North Star Borough Sch. Dist.*, 323 F.3d 1185, 1196-97 (9th Cir. 2003). If a plaintiff is able to assert a prima facie retaliation claim, the "burden shifting" framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002).

Under *McDonnell Douglas*, once a plaintiff makes out a prima facie case of retaliation, "the burden shifts to [the defendant] to articulate a legitimate,

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

non-discriminatory reason for the adverse employment action." *Manatt v. Bank of Am., N.A.*, 339 F.3d 792, 800 (9th Cir. 2003). If the defendant articulates such a reason, the plaintiff "bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." *Id.* (internal quotation marks and citation omitted).

Here, assuming Ford meets the first element in establishing a prima facie case of retaliation by showing that he engaged in protected activity in filing discrimination complaints, the Court concludes that he has failed to demonstrate that he suffered an adverse employment action or that there was a causal link between his filing of the complaints and any employment action by Defendants. As conceded by Ford, discussed above, the only actions taken by Defendants that are not barred by statute of limitations, for purposes of his Title VII retaliation claim, are those occurring on or after July 27, 2007. Therefore, the only actions referred to by Ford in support of his Title VII retaliation claim are those of WSH in responding to Standard's request for Ford's employment information and Stratton in filling out the ESD separation statement with incorrect information regarding Ford's ability to return to his previous position as a PSA. *See* Dkt. 35 at 16-17. Ford presents no evidence, or legal authority, either in his response to Defendants' motion or in the record, to show that WSH's alleged slow response in providing documents to Standard amounted to an adverse employment action. Similarly, Ford has failed to show that Stratton's incorrect response contained in the ESD separation statement constituted an adverse employment action as ESD was able to get the correct information regarding Ford's ability to return to his previous position and his unemployment benefits were approved. Dkt. 24 at 24-25. Even if the Court were to assume that WSH and Stratton's conduct did constitute adverse employment actions, Ford has shown no evidence of any causal connection between such conduct and Ford's discrimination complaints. Finally, even assuming Ford was able to establish a prima facie case of retaliation, Defendants have offered legitimate, non-discriminatory reasons

ORDER - 10

1 | for their actions and Ford failed to present any evidence that these reasons for the actions

2 | taken were pretextual.  That is, WSH has stated that it is a large bureaucracy and that

3 | responding to requests such as that made by Standard can take a significant amount of

4 | time.  *See* Dkt. 26.  In addition, Stratton maintains that he filled out the ESD separation

5 | statement with the information that he had at the time.  *See id.*  Ford has presented no

6 | evidence to show that either of these reasons were actually a pretext for retaliation.

7 | Therefore, the Court concludes that Defendants' motion for summary judgment on Ford's

8 | Title VII retaliation claim should be granted.

9 | ## IV. ORDER

10 | Therefore, it is hereby **ORDERED** that Defendant's motion for summary

11 | judgment (Dkt. 23) is **GRANTED**, and Ford's claims are dismissed with prejudice.

12 | DATED this 17th day of February, 2011.

BENJAMIN H. SETTLE
United States District Judge

ORDER - 11